AMERICAN BANKERS
ASSOCIATION, et
al., Plaintiffs,

v.

NATIONAL CREDIT UNION
ADMINISTRATION, et
al., Defendants.

No. CIV. A. 99–00042(CKK).

United States District Court,
District of Columbia.

March 30, 2000.

Michael S. Helfer, Wilmer, Cutler & Pickering, Washington, DC, for plaintiff.

Leonard J. Rubin, Albert B. Krachman, Bracewell & Patterson, L.L.P., Washington, DC, for plaintiff intervenor.

Arthur R. Goldberg, Lois Bonsal Osler, United States Department of Justice, Washington, DC, for defendant.

David M. Malone, Ronald R. Glancz, Venable, Baetjer, Howard & Civiletti, L.L.P., Washington, DC, Paul J. Lambert, Bingham Dana, L.L.P., Washington, DC, for defendant intervenor.

## MEMORANDUM OPINION

KOLLAR–KOTELLY, District Judge.

This case is before the Court on the following dispositive motions: Defendant National Credit Union Administration's ("NCUA's") Motion to Partially Dismiss Plaintiff American Banker Association and Plaintiff–Intervenor Independent Bankers Association of America's (together "Plaintiffs") First Amended Complaints; Defendant–Intervenor Credit Union National Association's ("CUNA's") Motion to Dismiss Plaintiffs' Facial Claims; Defendant–Intervenor National Association of Federal Credit Union's ("NAFCU's") Motion for

Partial Summary Judgment;[1] Defendant's Motion to Dismiss Plaintiff–Intervenor Irondequoit Federal Credit Union's ("Irondequoit's") First Amended Complaint; and Defendant–Intervenor CUNA's Motion to Dismiss same. In their amended complaints, Plaintiffs and Plaintiff–Intervenor challenge certain aspects of the NCUA's regulations—IRPS 99–1, see 63 Fed.Reg. 71,998 (1998)—interpreting the Credit Union Membership Access Act ("CUMAA") of 1998. Because the Court finds that the challenged policies constitute permissible interpretations of CUMAA, the Court shall dismiss Plaintiffs' and Plaintiff–Intervenor's facial challenges to IRPS–99. Plaintiffs also contest the NCUA's application of IRPS 99–1 in several instances. Some of these as-applied challenges rely so thoroughly on Plaintiffs' facial ones that they also must be dismissed.[2]

## I. BACKGROUND

In its earlier memorandum opinion denying Plaintiffs' motion for a preliminary injunction against the NCUA's application of IRPS 99–1, the Court engaged in a lengthy discussion of the statutory history and related aspects of this suit. Rather than reproduce that discussion, the Court incorporates it by reference here, and gives merely a brief account of the relevant background. See American Bankers v. Nat'l Credit Union Admin., 38 F.Supp.2d 114, 116–20 (D.D.C.1999). Congress enacted CUMAA in 1998 to amend the Federal Credit Union Act ("FCUA"), 12 U.S.C. § 1759, after the Supreme Court invalidated the reading NCUA had given to this statute since 1982. See National Credit Union Admin. v. First Nat'l Bank & Trust Co., 522 U.S. 479, 118 S.Ct. 927, 939–40, 140 L.Ed.2d 1 (1998). For those sixteen years, NCUA interpreted Section 109 of FCUA, relating to federal credit union membership, to permit the formation of "multiple common bond" credit unions. Finding this interpretation at odds with congressional intent, the Supreme Court held that the provision authorized NCUA to charter only two kinds of credit unions: "single common bond" credit unions, where a group sharing an occupational bond wished to form a credit union, and community-based ones. See id. In a demonstration of its commitment to preserving the strength and viability of credit unions, Congress assembled broad bipartisan support to enact the CUMAA, which explicitly wrote into law the interpretation that the Supreme Court had deemed impermissible under the former version of the statute. See S. Rep. 105–193 (1998).

Beyond merely ratifying the NCUA's policy of authorizing multiple common-bond credit unions, however, Congress also enunciated certain limitations relating to group size and geographic expansion. See H.R.Rep. No. 105–472, U.S.Code Cong. & Admin.News 1998, at 18. For example, Congress distinguished for purposes of analysis between groups with fewer than

---

1. Though purporting to be a motion for summary judgment, NAFCU's motion lacks the separate statement of material facts not in dispute required under the local rules. See District of Columbia Local Civ. R. 7.1(h) (formerly 108(h)). Nonetheless, Plaintiffs' "complaint, properly read, actually presents no factual allegations, but rather only arguments about the legal conclusion to be drawn about the agency action. As a result, the sufficiency of the complaint is the question on the merits, and there is no real distinction in this context between the question presented on a 12(b)(6) motion and a motion for summary judgment." Marshall County Health Care Authority v. Shalala, 988 F.2d 1221, 1226 (D.C.Cir. 1993)

2. Plaintiffs have voluntarily dropped Count Nine of their Amended Complaint, so the claim contained therein is no longer at issue. Because Counts Two and Three of Plaintiff–Intervenor Irondequoit's Amended Complaint echo Count Nine of Plaintiffs' Amended Complaint, the need to address these Counts also has been obviated. Moreover, neither Defendants nor Defendant–Intervenors have moved to dismiss Count Thirteen of Plaintiffs' Amended Complaint, or Count Three of Irondequoit's Amended Complaint. These counts state as-applied challenges that await future consideration.

3,000 members, which enjoy eligibility for inclusion in the field of membership of an existing multiple common-bond credit union, and those with more than 3,000 members, which must form separate single common-bond credit unions unless they meet specified criteria. *See* 12 U.S.C. § 1759(d)(1)-(2). In all cases, though, Congress directed the NCUA to "encourage the formation of separately chartered credit unions instead of approving an application to include an additional group within the field of membership of an existing credit union whenever practicable and consistent with reasonable standards for the safe and sound operation of the credit union ...." § 1759(f)(1)(A). Second, Congress specified that, when deciding which multiple common-bond credit union should absorb a given group, the NCUA must include the group "in the field of membership of a credit union that is within reasonable proximity to the location of the group." § 1759(f)(1)(B). Third, Congress described a community credit union as being composed of "[p]ersons or organizations within a well-defined local community, neighborhood, or rural district...," § 1759(b)(3), appending the qualifier "local" to the extant version of this provision. *Compare* CUMAA, § 1759(b)(3) (1998), *with* FCUA, § 1759 (1989).

Following a sixty-day notice-and-comment period, the NCUA promulgated IRPS 99-1 (the "final rule"), which established updated criteria for implementing the new statute. Several days after these regulations took effect (on January 1, 1999), Plaintiff American Bankers Association came to this Court seeking a preliminary injunction to enjoin several aspects of the final rule. In a Memorandum Opinion filed on March 10, 2000, *see American Bankers,* 38 F.Supp.2d at 114, the Court denied Plaintiff's Motion, ruling that Plaintiff had not demonstrated a likelihood of success on the merits of six out of seven claims. On the remaining claim, the Court found that Plaintiff failed to make its required showing of irreparable harm. *See id.* at 142. After the Court denied its

Motion for a Preliminary Injunction, Plaintiff, along with Plaintiff–Intervenor Independent Community Bankers of America, filed an Amended Complaint consisting of seventeen (17) counts. Several of those counts replicate ones preliminarily adjudicated on the earlier motion, and others, including one facial and several as-applied claims, are new. In addition, Plaintiff–Intervenor Irondequoit brings seven (7) counts in its Amended Complaint, most of which reflect the same challenges.

Below, the Court first shall treat those counts of Plaintiffs' Amended Complaint which it considered at the earlier stage, and then shall turn to the remaining facial claim. To the extent Irondequoit echoes facial claims contained in Plaintiffs' Amended Complaint, the Court will not embark on a separate discussion of those; claims that differ receive separate treatment.

## II.  DISCUSSION

■ Plaintiffs contend that, in several respects, the NCUA's final rule contravenes Congressional intent in drafting and enacting the CUMAA. Since " 'statutory interpretation begins with the language of the statute itself,' " *Butler v. West,* 164 F.3d 634, 639 (D.C.Cir.1999) (quoting *Pennsylvania Dep't of Pub. Welfare v. Davenport,* 495 U.S. 552, 557–58, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990)), as a general matter the Court first must determine whether Congress has spoken directly to the issue at hand. Following *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), this step has become known as *Chevron* step one. If, using "traditional tools of statutory construction," *Natural Resources Defense Council, Inc. v. Browner,* 57 F.3d 1122, 1125 (D.C.Cir.1995), the Court answers this inquiry in the affirmative, then "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Con-

gress." *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778.

■ But *Chevron* review also concerns itself with the extent and application of agency discretion in interpreting the statute at issue. In other words, "a reviewing court's inquiry under *Chevron* is rooted in statutory analysis and is focused on discerning the boundaries of Congress' delegation of authority to the agency." *Arent v. Shalala*, 70 F.3d 610, 615 (D.C.Cir.1995). To resolve the issue, "the question for the reviewing court is whether the agency's construction of the statute is faithful to its plain meaning, or, if the statute has no plain meaning, whether the agency's interpretation 'is based on a permissible construction of the statute.'" *Id.* (quoting *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778). If this interpretation is "reasonable and consistent with the statutory scheme and legislative history...," *Cleveland v. United States Nuclear Regulatory Comm'n*, 68 F.3d 1361, 1367 (D.C.Cir.1995), then the Court must defer to the agency. This inquiry into the agency's interpretation constitutes *Chevron* step two. Having already found significant ambiguity and/or delegation of interpretive authority to the agency in most of the relevant provisions of the CUMAA, *see, e.g., American Bankers*, 38 F. Supp.2d at 125 ("Congress's intent, whatever it may be, is by no means 'express' or 'clear' as the ABA maintains."), the Court shall concentrate on this second line of inquiry.

Below, the Court reviews first those facial challenges to the NCUA's final rule on which it ruled preliminarily at the earlier proceeding, and then the only new facial challenge in Plaintiffs' Amended Complaint, contesting the NCUA's interpretation of "local community" in section 1759(b)(3). Following the discussion of Plaintiffs' facial claims, the Court addresses each of Plaintiffs' as-applied challenges that Defendants have moved to dismiss, and, finally, considers Irondequoit's claims in light of the rulings below.

## A. *Facial challenges to IRPS 99–1*

### 1. *Challenges addressed at the preliminary injunction stage*

Plaintiffs challenge the following aspects of the NCUA's final rule in their most recent Complaint, all of which this Court addressed during the earlier proceeding: the NCUA's exclusion of family and household members when determining whether the group in question has fewer than 3,000 members for eligibility to join a "multiple common-bond credit union" (Count 1); the NCUA's alleged policy of permitting common-bond groups with more than 3,000 members to join existing credit unions even where they could "feasibly or reasonably establish a new single common-bond credit union" (Count 2); the rule requiring common-bond groups with fewer than 3,000 members to demonstrate their ability to successfully operate a credit union, rather than merely encouraging such groups to form separately chartered credit unions (Count 7); the alleged policy of permitting multiple common-bond credit unions to add new common-bond groups not "within reasonable proximity" to the existing credit union (Count 8); the policy of permitting persons who, after August 7, 1998, join a group whose members constitute a portion of a federal credit union to "grandfather" membership into the credit union (Count 15); the policy of permitting family and household members to enjoy "grandfathered" membership although not counted for the purpose of discerning whether the group has fewer than 3,000 members (Count 16); and the alleged policy of permitting "unlawfully formed credit unions" to grandfather membership eligibility (Count 17). Each of these claims arose at the earlier stage, and each received extensive treatment in the Court's memorandum opinion denying Plaintiff's application for a preliminary injunction. Plaintiffs have failed to persuade the Court that its original analysis of these claims was in error. Accordingly, with respect to each of these Counts, the Court incorporates by reference its earlier discussion of

Plaintiffs' facial challenges to the NCUA regulations, and provides merely a brief summary below.

In addition, Plaintiffs challenge the NCUA's policy of permitting "financially healthy credit unions" comprised of groups with fewer than 3,000 members to merge together without undergoing exacting scrutiny (Count 10). Although the Court found previously that Plaintiffs had demonstrated a likelihood of success on the merits of this claim, upon further review of the pleadings, the relevant provisions of both the CUMAA and the FCUA, and the legislative history, the Court has revised its opinion. In consequence, the Court includes a separate and lengthier discussion of this claim.

### a. *Family and household members*

■ The Court finds, once again, that Plaintiffs' challenge to the NCUA's decision not to include family members when calculating the membership of a group comports thoroughly with the statute. *See American Bankers*, 38 F.Supp.2d at 127–29. Section 1759(e)(1), which renders family and household members "eligible for membership in a credit union," suggests that this eligibility derives not from these members' common bond with the group, but rather from their intimate connection to persons in the group who share the common bond. Hence, FCUA's policy of excluding family and household members from the primary group that shares a common bond of occupation or association for the purpose of applying the 3,000 member

limit is a permissible reading of the CU-MAA.[3]

### b. *Groups with more than 3,000 members*

■ FCUA's interpretation of section 1759(d)(2)(A), which authorizes the NCUA to add a group with more than 3,000 members to an existing multiple common-bond credit union where the group could not feasibly or reasonably charter its own credit union, also survives *Chevron* scrutiny. *See American Bankers*, 38 F.Supp.2d at 121–24 (discussing the merits of this challenge, and deeming the field of membership criteria in IRPS–99 "eminently reasonable"). Although the CUMAA generally prohibits groups with more than 3,000 members from joining the field of membership of an existing credit union, this provision carves out an exception to that rule. Plaintiffs contend that IRPS–99 has impermissibly liberalized that exception by according excessive weight to the group's "desire." Pursuant to section 1759(d)(2)(A), the NCUA enjoys explicit discretion to ascertain the criteria necessary for "the likelihood of success in establishing and managing a new credit union." Given that the putative "desire" of the group speaks directly to its volunteer resources and other factors likely to determine its success in administering an effective credit union, this factor deserves serious consideration. Consistent with its statutorily conferred discretion, the NCUA's policy of according weight to a

---

**3.** Plaintiffs' attempts to resurrect this claim by reorienting the inquiry away from family and household members, and toward pensioners and annuitants, are unavailing. In Plaintiffs' omnibus opposition, they maintain that the NCUA's inclusion of "persons retired as pensioners and annuitants from the employer" in the field of membership of a common-bond credit union, *see* IRPS 99–1 at 72037, mandates the inclusion of these pensioners and annuitants in the group for the purpose of counting toward the 3,000 member limitation. *See* Pls.' Opp. at 7–9. The relevant count of Plaintiffs' Amended Complaint did not, how-

ever, target the NCUA's treatment of pensioners and annuitants, nor was it directed toward any other parties; rather, it focused solely on family and household members. *See* Am. Compl. ¶¶ 69–71. Although the analysis deeming reasonable the NCUA's policy of excluding family and household members from the preliminary group count also obtains with respect to pensioners and annuitants, the Court further notes that the motions under consideration pertain to the Complaint and the charges contained therein. Thus, the claim directed toward pensioners and annuitants is not properly before this Court.

group's intent is fully permissible under the CUMAA.[4]

### c. Groups with fewer than 3,000 members

■ Plaintiffs challenge the NCUA's policy of requiring smaller groups to offer evidence that they can operate a credit union with a reasonable chance of success. Whereas groups with more than 3,000 members "must be able to demonstrate why they *cannot* satisfactorily form a separate credit union if they want to be added to another credit union...," 63 Fed.Reg. at 72001 (emphasis added), groups with fewer than 3,000 members "must be able to demonstrate why they *can* successfully operate a credit union." *Id.* (emphasis added). As the Court found previously, Congress's two-tiered approach in the CUMAA reflects its understanding that smaller groups may lack the necessary resources for the "safe and sound operation" of a credit union. § 1759(f)(1)(A); *see also American Bankers*, 38 F.Supp.2d at 124–25. In light of Congress's evident concern for fiscal security, it is eminently reasonable for the NCUA to take a "hard look" at groups with fewer than 3,000 members to ascertain the economic feasibility of chartering new credit unions. *See id.* at 125–27.

### d. The NCUA's definition of "reasonable proximity"

■ When the NCUA incorporates a group into the field of membership of a multiple common-bond credit union, the agency must honor the "reasonable proximity" requirement enunciated in the CUMAA. Plaintiffs maintain that IRPS 99–1 impermissibly liberalizes this requirement by interpreting "a credit union that is within reasonable proximity to the location of the group...," § 1759(f)(1)(B), to include facilities ranging from the credit union's main office to a credit-union owned electronic facility effectively indistinguishable from an ATM. *See* Pls.' Am. Compl. ¶¶ 37–39. The NCUA's final rule provides that "the group to be added must be within the service area of a service facility of the credit union...," 63 Fed.Reg. at 72003, and specifies that, to qualify as a service facility, the machine in question must permit a member "to deposit funds, apply for a loan, and obtain funds on approved loans." *Id.* Though electronic, the service facility in question against which reasonable proximity is measured may not be a mere ATM. *Id.* at 72002. Plaintiffs endeavor to create a factual dispute by focusing on the extent to which an electronic service facility resembles an ATM. *See* Pls.' Opp. to Defs' Mots. at 34–40. Notwithstanding this attempt, however, the Court finds, as it did before, that the reasonableness of IRPS 99–1 does not stand or fall on the measure of this resemblance. *See American Bankers*, 38 F.Supp.2d at 130. In view of the discretion afforded the NCUA to decide the contours of this phrase, the agency's decision to account for the "advantages acquired from advancing technologies," 63 Fed.Reg. at 72002, is a permissible one.[5]

---

**4.** The first count of Irondequoit's Amended Complaint contests generally the agency's field of membership rule for multiple common-bond credit unions, calling it "arbitrary, capricious, and abuse of discretion, and not in accordance with law ...." Irondequoit's Am. Compl. ¶ 36; *see generally id.* ¶¶ 35–37. For the reasons that Court dismisses Counts One and Two of Plaintiffs' Amended Complaint, the Court must also dismiss Count One of Irondequoit's Amended Complaint.

**5.** Indeed, the departure from a policy that envisions a world of service centers where customers always receive personal attention from live representatives is both realistic, and in accordance with Congress's overarching intent in enacting the CUMAA: to "modernize[ ]" credit union law. *See* 144 Cong. Rec. H1868-02, H1874 (daily ed. April 1, 1998) (statement of Rep. Vento) ("Credit union law needs to be modernized, addressing the membership base of credit unions because they would not be able to sustain a membership base and reasonable services under the strict interpretation of a 1934 federal credit union law.").

e. *NCUA's interpretation of the CU-MAA's "grandfather" clause*

While delineating the parameters for the field of membership in single common-bond and multiple common-bond credit unions as well as community credit unions, the CUMAA also carves out an exception for persons or organizations that enjoyed membership in credit unions as of August 7, 1998, who continue to be eligible for membership. *See* § 1759(c)(1)(A). Plaintiffs challenge several aspects of the NCUA's policy with respect to this "grandfather" provision. First, they argue that the final rule impermissibly permits persons who were not members as of the relevant date to enjoy "grandfathered" membership eligibility. *See* Am. Compl. ¶¶ 63,125–27. Second, they maintain that the final rule impermissibly allows family and household members to benefit from "grandfathered" eligibility when those same persons are not counted as part of the primary "group" whose membership as of August 7, 1998 confers continued eligibility. *Id.* ¶¶ 64,129–31. Finally, they contend that NCUA violates the CUMAA by permitting unlawfully chartered community credit unions to "grandfather" additional members. *Id.* ¶¶ 65,133–35.

■ Plaintiffs' first challenge proved unpersuasive at the preliminary injunction stage, and it continues to do so. With the CUMAA, Congress sought to legitimate the formation of multiple common-bond credit unions in the wake of the Supreme Court's directive, and also to preserve those credit unions which the NCUA had chartered during the period of its misinterpretation of the FCUA. The statute authorizes "a member of any group whose members constituted a portion of the membership of any Federal credit union as of August 7, 1998[to] continue to be eligible to become a member of that credit union, by virtue of membership in that group, after August 7, 1998." § 1759(c)(1)(A)(ii). Plaintiffs have argued that the NCUA transgresses the CUMAA by permitting *new* additions to the group

in question to "grandfather" membership when this exception clearly applies to those who are, at the time of its enactment, already "member[s]." In this case, however, the seeming transparency of the phrase "member of any group" proves deceptive when read against the legislative history of this provision. Indeed, as the Court described in its prior opinion, *see American Bankers*, 38 F.Supp.2d at 134, Congress explicitly declared its intention that section 1759(c)(1)(A) "cover[ ] all persons or organizations or successors who were members of a federal credit union on the date of enactment of this Act, as well as anyone who is *or becomes* a member of a group representing a portion of the credit union's membership." H.R.Rep. No. 105–472, at 19 (emphasis added); *see also* S.Rep. No. 105–193, at 7 (providing that "any individual member of a group that is part of a credit union shall continue to be eligible to become a member of that credit union and any new member of such group is also eligible"). Accordingly, the NCUA's extension of "grandfathered" eligibility to new members of a group is not only permissible, but fully in agreement with congressional intent.

■ Next, Plaintiffs challenge the extension of this "grandfathered" eligibility to group members' immediate family and others in their households. Defendants contend, and the Court agrees, however, that this challenge is properly directed not toward the NCUA's interpretation of the CUMAA's "grandfather" provision, but toward its policy of extending membership eligibility to immediate family and household members, a policy predicated on the express language of section 1759(e)(1). *See* § 1759(e)(1) ("No individual shall be eligible for membership in a credit union on the basis of the relationship of the individual to another person who is eligible for membership in the credit union unless the individual is a member of the immediate family or household (as those terms are defined by the Board, by regulation) of the other person."); *see also* Def. NCUA's

Mot. Dismiss Pls.' First Am. Compl at 50–51. If the NCUA may extend "grandfathered" eligibility based on group membership, which indeed it must according to section 1759(c)(1)(A)(ii), then it may also offer "grandfathered" eligibility to immediate family or household members. Any other interpretation would create a peculiar caste system whereby certain group members may join credit unions and may confer this benefit upon their family and household members, whereas other group members may themselves "grandfather" into credit unions but may not share this opportunity with their family, their domestic partners, or anyone else. As the Supreme Court has admonished, "interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982). Not only is the scenario to which Plaintiffs' reading would give rise not mandated by the CUMAA, but it appears to contravene the statute's purpose in including these benefits of extended eligibility.

Finally, Plaintiffs seek to discredit the NCUA's policy with respect to "grandfathering" in members of community credit unions by charging that these community credit unions are illegally chartered. Since this allegation does not really address the NCUA's interpretation of the CUMAA's "grandfather" clause, but instead implicates the NCUA's practice of chartering community credit unions, the Court shall dismiss this claim, and shall consider Plaintiffs' challenge in the proper context.

f. *NCUA's policy of permitting groups with fewer than 3,000 members to merge voluntarily*

■ Under the CUMAA, the field of membership limitations do not apply to any group that the NCUA transfers from another credit union in connection with a merger the agency deems necessary for "safety and soundness" reasons. § 1759(d)(2)(B)(i). In addition, the NCUA's final rule "permits the voluntary merger of healthy multiple common bond credit unions containing select employee groups of less than 3,000 primary potential members without regard to the statutory analysis that is required when non-affiliated groups of less than 3,000 members seek to join an existing credit union." 63 Fed. Reg. at 72003. Plaintiffs challenge this provision, arguing that it constitutes a violation of the CUMAA. particularly section 1759(f)(1)(A).[6] This section directs the NCUA to "encourage the formation of separately chartered credit unions instead of approving an application to include an additional group within the field of membership of an existing credit union whenever practicable and consistent with reasonable standards for the safe and sound operation of the credit union." § 1759(f)(1)(A). Because the NCUA's final rule permits financially healthy credit unions to merge together, Plaintiffs contend, it contravenes Congress's express mandate as articulated in this section. *See* Am. Compl. ¶¶ 44–46.

In its earlier consideration of this claim, the Court agreed with Plaintiffs' assessment. The Court took the language of section 1759(f)(1)(A), particularly the word "shall," to indicate Congress's unambiguous objective that the agency encourage the formation of separately chartered credit unions wherever feasible. *See American Bankers*, 38 F.Supp.2d at 137. Commenting that "[s]hall" is "language of an unmistakably mandatory character," *Hewitt v. Helms*, 459 U.S. 460, 471, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), the Court reasoned that in this provision, unlike in so many others in the CUMAA, Congress left no discretion to the NCUA. *See American Bankers*, 38 F.Supp.2d at 137; *see also*

---

**6.** Count Four of Irondequoit's First Amended Complaint also contests this aspect of the NCUA's final rule. *See* Irondequoit's Am.

Compl. ¶¶ 47–48. Accordingly, this discussion also applies to Irondequoit's claim.

*Her Majesty the Queen v. U.S. EPA,* 912 F.2d 1525, 1533 (D.C.Cir.1990). Instead, Congress assigned the agency a fundamental mandate: to encourage the formation of separate credit unions instead of expanding existing ones whenever practicable and reasonable.

Defendants, however, have offered a compelling argument for a different reading. They contend that section 1759(f) does not apply to mergers because it specifically targets "expansions" of existing credit unions effected by the addition of a single group. *See* Def.'s Mot. Dismiss at 33–36; CUNA's Mot. Dismiss Defs.' Facial Challenges at 16–20. In support of this argument, Defendants direct the Court's attention toward the language in section 1759(f)(a)(A), speaking of *"an* additional group," and section 1759(f)(1)(B), providing an alternative where "the formation of a separate credit union by *the group* is not practicable or consistent with the standards referred to in subparagraph (A) . . . ." § 1759(f)(1)(B) (emphasis added); *see* Def.'s Mot. Dismiss at 34. With this language, they maintain, Congress meant to describe situations in which a single group wishes to be added to the field of membership of an existing credit union, and not ones in which multiple common-bond credit unions consisting of many groups wish to merge together. Furthermore, CUNA points out that Congress most likely did not intend its directive to apply to mergers because mergers, which almost always involve the combination of two healthy credit unions, logically would *never be permissible* if covered by this mandate. *See* CUNA's Mot. Dismiss at 18. The ambiguities that emerge with these observations, Defendants suggest, should at the very least invoke *Chevron* step two analysis, and therefore deference to the agency's interpretation.

Even were the Court to dismiss these readings as implausible, it could not overlook the legislative history supporting Defendants' position. When ruling on the motion for a preliminary injunction, the Court was unaware of any legislative history directly addressing the issue of voluntary mergers. Upon further research, however, the Court has unearthed a comment by one of the co-authors of the CU-MAA that tends to buttress the NCUA's interpretation. Representative Kanjorski, addressing his colleagues on the House floor, noted the need for elaborations of certain technical provisions contained in the statute, "particularly since there will be no formal conference report on the bill." 144 Cong. Rec. H7037, H7045 (Aug. 4, 1998). Speaking of subparagraph C of section 1759(d)(2), which excepts from the 3,000 member limit "any group transferred in connection with a voluntary merger, having received conditional approval by the Administration of the merger application . . ." prior to a specified date, Representative Kanjorski explained that this exception was not intended to interfere with the NCUA's general authority to approve or disapprove voluntary mergers. He clarified that

> in granting this specific retroactive exception from the multiple common bond requirements we are not in any way diminishing the existing authority of the National Credit Union authority under section 205 of the Federal Credit Union Act to grant or withhold approval for voluntary mergers of credit unions. All of the federal banking regulators, including the National Credit Union Administration, have broad authority to approve and disapprove mergers of institutions under their jurisdiction, and this legislation is not intended to obstruct that authority in any way.

*Id.* Although "[t]he remarks of a single legislator, even the sponsor, are not controlling in analyzing legislative history . . . ." *Chrysler Corp. v. Brown,* 441 U.S. 281, 311, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979), it is also true that remarks such as those provided by Representative Kanjorski are potentially useful in providing evidence of congressional intent when "they are consistent with the statutory language

and other legislative history." *Brock v. Pierce County*, 476 U.S. 253, 259, 106 S.Ct. 1834, 90 L.Ed.2d 248 (1986); *see also United States v. McGoff*, 831 F.2d 1071, 1090–91 (D.C.Cir.1987).

Section 205 of the FCUA requires written approval by the NCUA for all voluntary mergers between insured credit unions and other insured or uninsured credit unions. *See* 12 U.S.C. § 1785(b)(1)-(2). In addition, this section enumerates a list of six factors which the NCUA must consider in granting or withholding approval or consent for a voluntary merger.[7] Congress chose not to amend this section, but rather to carve out an exception to the field of membership limit of 3,000 persons for groups transferred in connection with a voluntary merger approved and consummated during a specified period of time. *See* § 1759(d)(2)(C). The CUMAA makes no mention of groups with fewer than 3,000 members in the context of voluntary mergers, but does refer to groups with more than 3,000 members in that context. In reflecting on this disparity, the Court is mindful that, " 'where Congress includes particular language in one section of a statute, but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' " *Independent Bankers Ass'n v. Farm Credit Admin.*, 164 F.3d 661, 667 (D.C.Cir.1999) (quoting *Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983)) (internal quotation omitted). Moreover, the explanation of at least one legislator suggests that Congress intended to leave substantial authority with the agency to decide matters involv-

ing voluntary mergers. In view of these factors, the Court finds that the NCUA's policy of permitting healthy multiple common-bond credit unions consisting of groups with fewer than 3,000 members falls within the purview of statutorily conferred agency discretion.

2. *The challenge not addressed at the preliminary injunction stage—the NCUA's definition of "local community"*

■ In their Amended Complaint, Plaintiffs also charge that the NCUA has adopted a definition of "local community" that contravenes Congress's intent in redefining the specifications for a community-based credit union. *See* § 1759(b)(3) (describing the field of membership for community credit unions as "[p]ersons or organizations within a well-defined local community, neighborhood, or rural district."). Specifically, Plaintiffs claim that the NCUA's field of membership rule violates the CUMAA by establishing impermissibly liberal standards for the formation of community credit unions (Count 12); and that the agency relies, in violation of federal law, on "racial demographics" when evaluating whether a designated area constitutes a "community" (Count 14). The Court shall address these claims in turn.[8]

The CUMAA expressly delegates to the agency the task of defining the phrase "well-defined local community, neighborhood, or rural district." § 1759(g)(1) ("The Board shall prescribe, by regulation, a definition for the term 'well-defined local community', neighborhood, or rural district for the purpose of—(A) making any

---

7. These six factors are:
(1) the history, financial condition, and management policies of the credit union; (2) the adequacy of the credit union's reserves; (3) the economic advisability of the transaction; (4) the general character and fitness of the credit union's management; (5) the convenience and needs of the members to be served by the credit union; and (6) whether the credit union is a cooperative association organized for the purpose

of promoting thrift among its members and creating a source of credit for provident or productive purposes.
§ 1785(c)(1)-(6).

8. Irondequoit also challenges the NCUA's standards for chartering community credit unions. *See* Irondequoit's Am. Compl. ¶¶ 51–52 (Count Five). This discussion pertains to that claim as well.

determination with regard to the field of membership of a credit union described in subsection (b)(3); and (B) establishing the criteria applicable with respect to any such determination."). Arguing that the CU-MAA's addition of the word "local" in this phrase "altered and narrowed potential membership in 'community credit unions...,'" Am. Compl. ¶ 47, Plaintiffs maintain that the NCUA's final rule actually "relaxes the requirements for forming certain community credit unions, and improperly gives effect to its interpretation of the old, less restrictive statutory definition of 'community credit union.'" Id. ¶ 49. In addition, they contest the NCUA's creation of a "presumptive community," or its policy of according a presumption in favor of a proposed community credit union if

> (1) the area to be served is in a recognized single political jurisdiction, i.e., a county or its political equivalent or any contiguous political subdivisions contained therein, and if the population of the requested well-defined area does not exceed 300,000, or (2) the area to be served is in multiple contiguous political jurisdictions ... and if the population of the requested well-defined area does not exceed 200,000.

63 Fed.Reg. at 72,037–38.

Defendants, in turn, offer a persuasive account of the process by which the NCUA formulated its policy "to limit the community to a single, geographically well-defined area." 63 Fed.Reg. at 72,037; see also Def.'s Mot. Dismiss at 39–40. Based on its experience of administering community credit unions and its extensive analysis responding to the commentary it received under the notice-and-comment period, the NCUA designed a viable policy for carrying out Congress's mandate. This policy entails three fundamental requirements for the chartering of community credit unions: (1) clearly defined boundaries circumscribing the geographic area; (2) establishment by the charter applicant that the area is a well-defined "local com-

munity, neighborhood, or rural district"; and (3) residents with common interests or interaction. Id. at 72,011. The agency also provides examples of factors which an applicant might offer as probative of the requisite common interests and interaction, including "the existence of a single major trade area, shared governmental or facilities, local festivals, [and] area newspapers ...." Id. at 72,012. Moreover, the NCUA defends its practice of assigning a presumption in favor of certain applicants based on the area's population and status as a single political jurisdiction (as well as contiguous political jurisdictions), whereby the agency requires minimal evidence demonstrating that the applicant is, in fact, a local community under its definition. According to the agency, this "streamlined approach" derives from the NCUA's extensive experience and expertise in chartering community credit unions. See Mot. Dismiss at 42–43.

"As the agency charged with interpreting the complicated statutory provisions that comprise the [CUMAA, the NCUA] is entitled to considerable deference in the interpretive process of making the regulatory machinery work." Natural Resources Defense Council, Inc. v. U.S. EPA, 859 F.2d 156, 226 (D.C.Cir.1988). Here, Congress explicitly delegated to the agency the responsibility for defining and applying the "local community" standard. See § 1759(g)(1). In accordance with Chevron deference, then, the Court will only disturb the NCUA's interpretation of this provision if it finds that interpretation "impermissible." See Chevron, 467 U.S. at 845, 104 S.Ct. 2778 (where the agency's interpretation constitutes a "reasonable accommodation ..., we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned"); see also Chemical Mfrs. Ass'n v. Natural Resources Defense Council, Inc., 470 U.S. 116, 125, 105 S.Ct. 1102, 84 L.Ed.2d 90 (1985) (clarifying that the agency's interpretation "need not be the

only permissible construction that [it] might have adopted"). Because the NCUA's interpretation of the "local community" provision of the CUMAA is in no way "arbitrary, capricious or manifestly contrary to the statute...," *Chevron*, 467 U.S. at 844, 104 S.Ct. 2778, the Court shall dismiss Count 12 of Plaintiffs' Amended Complaint.[9]

In determining whether a given area is a community, the NCUA has established that it may consider "[c]ommon characteristics and background of residents (for example, income, religious beliefs, primary ethnic groups, similarity of occupations, household types, primary age group, etc.) ...." 63 Fed.Reg. at 72,038. Plaintiffs contend that this consideration of "primary ethnic groups" constitutes "'redlining' on the basis of race when defining a credit union's lending market, in contravention of the Equal Credit Opportunity Act ...." Am. Compl. ¶ 53. Plaintiffs' challenge must be dismissed, however, on several grounds. First, as Defendant points out, they lack standing to bring this claim, given that they allege no injury to themselves or to others based upon the NCUA's purported violation. *See* Mot. Dismiss at 44. Second, their allegation that the NCUA's use of racial demographics amounts to impermissible "redlining" fails logically: by taking into account ethnic, among myriad other, characteristics to discern if the residents of a given area share "common interests or interaction," the NCUA is not dictating who may take part in a credit transaction, but is rather evaluating whether an area constitutes a "local community." Even if Plaintiffs wish to contest the principle that common ethnic or racial identity is or should be one ingredient of a "community," they do not bring a valid challenge under the FCUA or the Equal Credit Opportunity Act.[10] Hence, this claim shall be dismissed.

## B. *Plaintiffs' as-applied claims*

In addition to their challenges to the NCUA's final rule as written, Plaintiffs bring a series of claims contesting particular chartering decisions made by the agency. In Counts Three, Four, Five, and Seven, Plaintiffs allege that the NCUA authorized the addition of the QVC Common–Bond Group to Franklin Mint in violation of section 1759. Count Three challenges this authorization on the grounds that the NCUA impermissibly declined to count family and household members of persons comprising the QVC group when calculating that the total number in the group did not reach 3,000. *See* Am. Compl. ¶¶ 77–79. Counts Four and Five contend that, given this impermissible calculation, the NCUA authorized the addition of a common-bond group with more than 3,000 members to join an existing credit union based solely upon the group's representation that it did not "desire" to establish a new single common-bond credit union. *See id.* ¶¶ 81–83. Count Six accepts for the purpose of its claim that QVC has fewer than 3,000 members, and challenges the NCUA's approval of QVC's addition to Franklin Mint without first en-

---

9. The Court notes that Plaintiffs' contentions that the NCUA violated the CUMAA in chartering specific community credit unions are not relevant to the question of whether its final rule offers a permissible interpretation of the statute. *See* Am. Compl. 55–61. Moreover, it seems entirely appropriate that the NCUA's rule be flexible enough to account for the remarkably broad range of potential "local communities" in a nation as demographically and geographically diverse as our own.

10. Nor does their challenge state a valid constitutional claim. Not only have Plaintiffs waived this constitutional argument by omitting it in their Complaint, and only raising it in their omnibus opposition, *see* Pls.' Opp. at 60, but the argument fails on its merits. The government may acknowledge that race and ethnicity are at work without being motivated in its decisions by impermissibly acting on the basis of race. *See Shaw v. Reno*, 509 U.S. 630, 646, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) (remarking that mere awareness of race "does not lead inevitably to impermissible race discrimination").

couraging QVC to form a separate credit union. *See id.* ¶¶ 93–95.

The validity of each of these claims depends on the validity of Plaintiffs' corresponding facial challenges to the NCUA's final rule. In the foregoing discussion, the Court determined that the NCUA's practice of excluding family and household members when calculating the size of the primary group is entirely permissible under the statute. Moreover, the Court found that the NCUA may accord substantial weight to a group's intent when considering whether the formation of a separate credit union is practicable. Finally, the Court concluded that the NCUA's policy of taking a "hard look" at smaller groups before chartering a separate credit union constitutes a reasonable interpretation of the CUMAA's mandate. Because each of these corresponding facial claims must be dismissed, Plaintiffs' challenges to the NCUA's decision to permit the QVC Common–Bond Group to join Franklin Mint cannot stand. Accordingly, the Court dismisses Counts Three, Four, Five, and Seven of Plaintiffs' Amended Complaint.

In Count Eleven, Plaintiffs challenge the NCUA's approval of two specific mergers between federal credit unions: (1) the merger of Visions Federal Credit Union and Two Rivers Federal Credit Unions; and (2) the merger of State Employees Federal Credit Union and Valley Industrial Employees Federal Credit Union. *See* Am. Compl. ¶¶ 109–111. This challenge relies upon Plaintiffs' contention that the NCUA's policy with respect to voluntary mergers violates section 1759 of the CUMAA. In its discussion above, however, the Court has determined that this contention is belied by the statutory language, the interaction between the CUMAA and Section 205 of the FCUA, and the legislative history. Hence, the Court also must dismiss this count of Plaintiffs' Amended Complaint.

#### C. *Irondequoit's remaining challenges*

In Count Six of its Amended Complaint, Irondequoit alleges that the NCUA has failed adequately to protect "small credit unions from competition with larger, overlapping credit unions." Irondequoit's Am. Compl. ¶ 55. In failing thus to protect smaller credit unions from "overlapping," Irondequoit maintains, the NCUA violates "the intent of the FCUA ...." *Id.* This allegation fails to state a claim because it relies merely on a general characterization of the statute's "intent," without pointing to any specific statutory or other legal basis upon which to conclude that the NCUA has a duty to safeguard small credit unions against competition.

Count Seven of Irondequoit's Amended Complaint must also fall. There Irondequoit contends that the NCUA fails "to enforce the restrictions on credit union membership established by the FCUA, including even those few restrictions reflected in its membership rule." *Id.* ¶ 59. There is ample precedent, however, for the proposition that "an agency's decision not to take enforcement action should be presumed immune from judicial review under [the APA]." *Heckler v. Chaney,* 470 U.S. 821, 832, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985); *see also Shoshone–Bannock Tribes v. Reno,* 56 F.3d 1476, 1481 (D.C.Cir.1995) ("Courts are ill-equipped to evaluate the factors that go into a decision not to bring suit or to enforce regulations."). Irondequoit has presented no reasons why this case presents an exception to this presumption of immunity, and therefore its claim must be dismissed.

### III. CONCLUSION

For the foregoing reasons, Plaintiffs' Amended Complaint, with the exception of the as-applied challenge contained in Count Thirteen, shall be dismissed for failure to state a claim. Moreover, all counts of Irondequoit's Amended Complaint also shall be dismissed. An appropriate order accompanies this memorandum opinion.

### ORDER

For the reasons expressed in the accompanying Memorandum Opinion, it is, this 30 of March, 2000, hereby

ORDERED that Defendant National Credit Union Administration's Motion to Partially Dismiss Plaintiffs' Amended Complaint [# 65] is GRANTED; and it is further

ORDERED that Defendant–Intervenor Credit Union National Association's Motion to Dismiss Plaintiffs' Facial Challenges [# 64] is GRANTED; and it is further

ORDERED that Defendant–Intervenor National Association of Federal Credit Union's Motion for Partial Summary Judgment [# 66] is GRANTED; and it is further

ORDERED that Defendant–Intervenor Credit Union National Association's Motion to Dismiss Irondequoit Federal Credit Union's First Amended Complaint [# 70] is GRANTED; and it is further

ORDERED that Defendant–Intervenor National Association of Federal Credit Union's Motion to Dismiss Irondequoit's First Amended Complaint [# 71] is GRANTED; and it is further

ORDERED that the parties shall meet and confer, and shall submit by April 14, 2000 a joint status report advising the Court as to whether the rulings and analysis contained in the accompanying Memorandum Opinion dispose of the remaining count of Plaintiffs' Amended Complaint (Count 13); or, if not, as to how they propose to litigate that count.

**SO ORDERED.**