AMERICAN BANKERS
ASSOCIATION,
Appellant,

v.

NATIONAL CREDIT UNION
ADMINISTRATION, et
al., Appellees.

No. 00–5195.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 5, 2001.
Decided Nov. 9, 2001.

Eric Mogilnicki argued the cause for appellant. With him on the briefs were Christopher R. Lipsett, Jonathan M. Mastrangelo, John J. Gill and Michael F. Crotty. Kimberly A. Parker entered an appearance.

Michael E. Robinson, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were Kenneth L. Wainstein, U.S. Attorney, Jacob M. Lewis, Attorney, U.S. Department of Justice, and John K. Ianno, Counsel, National Credit Union Administration.

William J. Donovan, David M. Cherubin, Paul J. Lambert, Gerard P. Finn and Robert M. Krasne were on the joint brief for intervenors-appellees Credit Union National Association, National Association of Federal Credit Unions, and State Employees Federal Credit Union. Theodore W. Ruger and Peter S. Leyton entered appearances.

Before: RANDOLPH, ROGERS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

The American Bankers Association challenges a National Credit Union Administration rule governing chartering and membership standards for federal credit unions. According to the ABA, the rule violates the Credit Union Membership Access Act of 1998, pursuant to which the Administration issued the rule. Except for one claim that we dismiss as moot and another as unripe, we find the ABA's arguments without merit and affirm the district court's dismissal of the case.

## I.

The Federal Credit Union Act (FCUA), 12 U.S.C. §§ 1751–1795k, provides for the establishment of federal credit unions and governs their operations. A credit union is a "cooperative association organized in accordance with the provisions of [the FCUA] for the purpose of promoting thrift among its members and creating a source of credit for provident or productive purposes." *Id.* § 1752(1). The National Credit Union Administration "may prescribe rules and regulations for the ... administration of the [FCUA]," *id.* § 1766(a), and charters, examines, and supervises federal credit unions, *see id.* §§ 1753, 1754, 1756.

As originally enacted, the FCUA limited credit union membership to "groups having a common-bond of occupation or association, or to groups within a well-defined

neighborhood, community, or rural district." FCUA, Pub.L. No. 73–467, § 9, 48 Stat. 1216, 1219 (1934) (codified at former 12 U.S.C. § 1759 (amended 1998)). Starting in 1982, the Administration began permitting multiple occupational groups, i.e., groups with different common bonds, to combine into one "multiple common-bond credit union." Interpretative Ruling and Policy Statement (IRPS) 82–1, 47 Fed. Reg. 16,775, 16,775 (Apr. 20, 1982). In 1998, the Supreme Court, affirming a decision of this court, held that the FCUA prohibited such credit unions. *See Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 499–501, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998). Later that year, however, Congress amended the FCUA to authorize multiple common-bond credit unions. Credit Union Membership Access Act, Pub.L. No. 105–219, § 2, 112 Stat. 913, 914–15 (1998) (amending 12 U.S.C. § 1759(b)).

As amended, the FCUA permits three types of credit unions, each defined by a different "membership field": single common-bond credit unions, comprised of one group having a common occupational or associational bond; multiple common-bond credit unions, comprised of more than one such group; and community credit unions. 12 U.S.C. § 1759(b)(1)–(3). Pursuant to what the parties call a "grandfather clause," the FCUA exempts certain previously existing "members and groups" from the new membership field provisions. *Id.* § 1759(c)(1). The FCUA also imposes several limitations and conditions on multiple common-bond credit union formation and growth, including: (1) restricting multiple common-bond credit unions to groups with less than 3,000 members, *id.* § 1759(d)(1), unless certain exceptions apply, including where a larger group "could not feasibly or reasonably" form its own credit union, *id.* § 1759(d)(2)(A); (2) directing that the Administration "encourage" a group seeking to join an existing credit union to form its own separately chartered credit union instead, *id.* § 1759(f)(1)(A); (3) requiring that in order to be added to an existing credit union a group be within "reasonable proximity" of that credit union, *id.* § 1759(f)(1)(B); and (4) requiring that where an existing credit union seeks to include an additional group, the credit union must satisfy certain "approval criteria" concerning its financial soundness and administrative capabilities, and that any harmful effect the expansion will have on any other credit union must be "clearly outweighed in the public interest by the probable beneficial effect of the expansion," *id.* § 1759(f)(2). Finally, the 1998 Amendments added the word "local" to the community credit union definition, thus confining such credit unions to "well-defined local communit[ies], neighborhood[s], or rural district[s]." *Id.* § 1759(g)(1).

Following notice and comment, the Administration issued a final rule implementing the 1998 Amendments. *See* IRPS 99–1, 63 Fed.Reg. 71,998 (Dec. 30, 1998). Several of the rule's provisions regarding multiple common-bond credit unions are at issue in this case. First, although the rule allows the immediate family and household of a group member, as well as "[p]ersons retired as pensioners and annuitants," to join the group's multiple common-bond credit union, the rule does not count these persons toward the 3000–member limit. *Id.* at 72,002, 72,037. Second, in determining whether a group with 3000 or more members "could not feasibly or reasonably" form its own credit union, 12 U.S.C. § 1759(d)(2), the Administration considers the group's "desire and intent," 63 Fed. Reg. at 72,002. Third, while the rule requires groups with 3000 or more members to "demonstrate why they cannot satisfac-

torily form a separate credit union if they want to be added to another credit union," it requires groups with fewer than 3000 members to "demonstrate why they can successfully operate a credit union" in order to be separately chartered. *Id.* at 72,001. Fourth, the rule permits healthy multiple common-bond credit unions comprised of groups with fewer than 3000 members to merge with each other "without regard to the statutory analysis that is required when [such groups] ... seek to join an existing credit union." *Id.* at 72,003.

Also at issue in this case are the rule's provisions implementing the FCUA's grandfather clause, "reasonable proximity" requirement, and "well-defined local community" standard. *See* 63 Fed.Reg. at 71,998, 72,003, 72,015, 72,037–38. Under the rule, the grandfather clause covers not just individuals who were members of a group at the time the FCUA was amended, but also those who subsequently become members of the group. *Id.* at 72,015. The rule provides that a group is within "reasonable proximity" of a credit union if it is within the "service area of a service facility of the credit union"; a service facility includes a "credit union owned electronic facility" other than an automated teller machine. *Id.* at 72,002–03. Finally, the rule establishes criteria to implement the statute's "well-defined local community" standard and adopts a presumption that certain areas, defined by political jurisdiction and population, meet that standard. *Id.* at 72,037–38.

Alleging that these provisions of the rule violate the FCUA, appellant, the American Bankers Association (ABA), filed suit in the United States District Court for the District of Columbia pursuant to the Administrative Procedure Act. *See* 5 U.S.C. § 706. Underlying all of the ABA's claims is its belief that the rule is too permissive with respect to credit union formation and growth. Except for the provision regarding pensioners, which the district court found the ABA's amended complaint failed to challenge, the district court concluded that each of the challenged provisions reflects a reasonable interpretation of the FCUA and dismissed the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

Renewing the arguments it made in the district court, the ABA appeals. Three organizations representing credit unions intervened to defend the rule. We review the district court's Rule 12(b)(6) dismissal de novo. *See, e.g., Brown v. Plaut,* 131 F.3d 163, 167 (D.C.Cir.1997).

## II.

Before considering the merits of the ABA's claims, we must deal with its preliminary argument that the district court erred by failing to direct the Administration to produce the administrative record. According to the ABA, the district court needed the administrative record in order to consider its "claims under the APA, challenging NCUA's rule and certain expansions on the ground that the agency's actions were 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'" Appellant's Opening Br. at 17 (quoting amended complaint). Having reviewed the amended complaint, however, we agree with the district court that the ABA's argument that the challenged provisions violate the FCUA can be resolved with nothing more than the statute and its legislative history. *See Am. Bankers Ass'n v. Nat'l Credit Union Admin.,* 93 F.Supp.2d 35, 48–49 (D.D.C.2000); *see also Sierra Club v. United States Fish & Wildlife Serv.,* 245 F.3d 434, 440 n. 37 (5th Cir.2001) ("Although the administrative record for the regulation is not before this Court, that is

of no moment. Our review is limited to interpreting the extent to which the regulation is consistent with the statute—a task which we are competent to perform without the administrative record.") (citing *INS v. Cardoza–Fonseca*, 480 U.S. 421, 447, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)). Although the ABA now hints that it also asserted a challenge to the Administration's rule-making process, we can find no such claim in the amended complaint. Nor, and again contrary to what the ABA says, can we find any challenge to the manner in which the Administration has applied the rule in specific cases that does not depend entirely on the argument that the rule itself violates the statute. Should the ABA have concerns about the Administration's application of the rule to specific cases, it remains free to bring an as-applied challenge.

Because the ABA argues that the provisions of the rule it challenges violate the FCUA, a statute the Administration is charged with enforcing, we proceed in accordance with *Chevron's* familiar two-part test. *See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Although *Chevron* step one analysis begins with the statute's text, we must not "confine [ourselves] to examining a particular statutory provision in isolation. The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000). We must also "exhaust the traditional tools of statutory construction," *Natural Res. Def. Council, Inc. v. Browner*, 57 F.3d 1122, 1125 (D.C.Cir.1995) (internal quotation marks and citation omitted), including examining the statute's legislative history to "shed new light on congressional intent, notwithstanding statutory language that appears superficially clear," *id.* at 1127

(internal quotation marks and citation omitted). And, of course, "we must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision ... to an administrative agency." *Brown & Williamson*, 529 U.S. at 121, 120 S.Ct. 1291. If, applying these principles, we find that "Congress has directly spoken to the precise question at issue ... that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778.

■ Only if we find the statute either silent or ambiguous with respect to "the precise question at issue" do we proceed to *Chevron's* second step, asking "whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 842–44, 104 S.Ct. 2778. But not in this case. Although the district court resolved all issues on the basis of *Chevron* step two analysis, *Am. Bankers*, 93 F.Supp.2d at 40, the ABA rests its appeal entirely on *Chevron* step one. Throughout its opening brief, the ABA uses only *Chevron* step one language: "the District Court misapplied *Chevron* ... by upholding actions that are contrary to the clearly expressed intent of Congress," Appellant's Opening Br. at 11; "the language of the FCUA expressly rejects NCUA's policy choice," *id.* at 26; "Congress makes plain," *id.*; "it is clear that Congress did not intend," *id.* at 28; "[the Administration] decided it could evade the plain meaning of [the statute]," *id.* at 29; "[the rule is unlawful] as a matter of simple English," *id.* at 35. Moreover, the brief never uses the word "unreasonable" nor any other language suggesting a *Chevron* step two argument. Even after the Administration and Intervenors responded with *Chevron* step one *and* two defenses, the ABA confined its reply brief to

straightforward *Chevron* step one arguments: "policy considerations cannot trump the clearly expressed intent of Congress," Appellant's Reply Br. at 7; "[the Administration's] argument is contrary to the plain language," *id.* at 9; "Congress did express an intent," *id.* at 12; "there is no basis to believe that Congress's concern did not apply," *id.* at 14. Accordingly, we will evaluate the ABA's claims under *Chevron* step one standards alone.

We begin with the ABA's challenge to the Administration's method for calculating the size of a common-bond group. Under the statute, the "membership field" of a multiple common-bond credit union is limited to groups comprised of persons sharing a common bond, 12 U.S.C. § 1759(b)(2), and "only a group with fewer than 3,000 members shall be eligible to be included in the field of membership category of a [multiple common-bond] credit union...." 12 U.S.C. § 1759(d)(1). Under the rule, the Administration counts only "primary potential members," 63 Fed.Reg. at 72,000, 72,002, i.e., persons sharing the occupational or associational bond that defines the group, toward the 3000–member limit. Although "by virtue of their close relationship to a commonbond group," certain other persons "may be included ... in the field of membership" of a common-bond credit union—that is, they may join the credit union—such persons are not counted toward the 3000–member limit. *Id.* at 72,037. These persons include immediate family and household members of primary potential members, as well as pensioners and annuitants. *Id.* We consider each category in turn.

### Family Members

■ Calling the rule's failure to count family members toward the 3000–member limit a "serious misreading of the Act," Appellant's Opening Br. at 21, the ABA argues that individuals are eligible to join a common-bond credit union only if they share the common bond. Therefore, the ABA claims, if family members are eligible for common-bond credit union membership, then they are necessarily group members and must be counted. The ABA also points out that subsection 1759(c) contains two "[e]xceptions" to subsection (b), the "membership field" provision—one for "grandfathered members and groups" and another for "underserved areas"—neither of which pertains to family and household members. 12 U.S.C. § 1759(c).

The ABA focuses too narrowly. Subsection 1759(b) expressly states that it is "subject to the other provisions of [Section 1759]," 12 U.S.C. § 1759(b), and section 1759 contains a provision relating to family and household members: the "Additional membership eligibility provisions," 12 U.S.C. § 1759(e). This subsection states:

No individual shall be eligible for membership in a credit union on the basis of the relationship of the individual to another person who is eligible for membership in the credit union, unless the individual is a member of the immediate family or household ... of the other person.

12 U.S.C. § 1759(e)(1). Though phrased as a limitation, subsection 1759(e) links credit union membership eligibility for family and household members to the personal relationship between such persons and group members (or other persons eligible for credit union membership), rather than to group membership. Moreover, the fact that this provision speaks of individuals' eligibility for credit union membership, while the 3000–member limit provision, 12 U.S.C. § 1759(d)(1), speaks of "group ... eligibil[ity] to be included in ... a [multiple common-bond] credit union," indicates that credit union members and group members do not entirely overlap. Under

these circumstances, we have no basis for concluding that the FCUA unambiguously requires the Administration to count family and household members toward the 3000–member limit.

The ABA insists that "the history of the statute" supports its view that section 1759(e)(1) provides no basis for family and household credit union membership eligibility other than sharing the common bond. Appellant's Opening Br. at 21. Specifically, it argues that prior to the 1998 Amendments, the Administration treated family and household members as part of the common-bond group, and that in the district court the Administration conceded that Congress "merely 'endorsed the agency's longstanding policy'" regarding these persons. Appellant's Opening Br. at 21–22 (quoting Admin. Mem. In Supp. Motion to Dismiss at 51 (internal quotation marks and citation omitted)). Although the ABA cites some evidence that supports this characterization of the Administration's prior policy, *see* 44 Fed. Reg. 43,737, 43,739 (July 26, 1979) (proposed rule characterizing family members as "additional persons [who] ... share a common bond with the basic group") (cited in Appellant's Opening Br. at 21–22), other evidence indicates that the matter is not so clear. For example, a 1994 Final Interpretive Ruling and Policy Statement describes family members as "secondary or derivative" members included in the field of membership "by virtue of their close relationship to a common bond group." 59 Fed.Reg. 29,066, 29, 093 (June 3, 1994) (cited in Intervenors' Br. at 13 n.6). Such conflicting evidence cannot clarify ambiguous statutory language. *See Ayuda, Inc. v. Thornburgh,* 880 F.2d 1325, 1345 (D.C.Cir.1989) ("[E]ither the plain language of the statute must be clear, or the legislative history and design of the act must illustrate a specific intent despite arguably ambiguous statutory language.")

(citations omitted), *vacated on other grounds,* 498 U.S. 1117, 111 S.Ct. 1068, 112 L.Ed.2d 1174 (1991).

### Pensioners

■ Unlike the FCUA's express provision for family and household members, the statute never mentions pensioners or annuitants. According to the ABA, this silence means that its argument that anyone eligible for multiple common-bond credit union membership must be counted toward the 3000–member limit applies even more forcefully in the case of pensioners. The district court concluded that the ABA had failed to raise this claim because the amended complaint mentions only family and household members in the relevant count. *Am. Bankers,* 93 F.Supp.2d at 41 n. 3. We agree.

In its original complaint, the ABA made only one allegation with respect to the Administration's method for calculating common-bond group size: that the rule unlawfully fails to count family and household members. *See* Complaint ¶ ¶ 40–42. The complaint never mentioned pensioners. In its amended complaint, the ABA continues to focus on family members, although pensioners are mentioned. The amended complaint describes how the rule permits certain persons whom the Administration does not count as group members—"persons in the immediate families or households of the credit unions [sic] members; pensioners and annuitants of a qualified business; spouses of persons who died when in the credit union's field of membership; and employees of the credit union"—to be eligible for credit union membership, Amended Complaint ¶ 24, and alleges that "if the persons listed in [this] section of the rule ... do not share the common bond, then they cannot be eligible for membership in a common-bond credit union," *id.* ¶ 28. The amended com-

plaint further alleges that the Administration's approval of a certain credit union's application to add an occupational common-bond group violated the statute because the Administration failed to count "members of the employees' immediate families, persons [who] retired as pensioners or annuitants ... and [s]pouses of persons who died" as group members. *Id.* ¶ 27 (internal quotation marks omitted). Like the original complaint, however, the amended complaint challenges only the failure to count family and household members. For example, immediately after describing the rule's failure to count pensioners and annuitants, among others, the amended complaint alleges that the rule is unlawful because it "excludes family members" and "counts only ... primary members." *Id.* ¶¶ 25, 26 (internal quotation marks omitted). Likewise, Count One objects to the rule's failure to count "certain members of the common bond, including family and household members," *id.* ¶ 69; neither Count One nor any of the other sixteen counts mentions pensioners. Under these circumstances, we doubt the Administration could have known that the ABA intended to challenge the rule's application to pensioners and annuitants. *See* FED. R. CIV. P. 8(a)(2); *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (setting forth notice pleading rule).

### III.

■ The FCUA's grandfather clause provides: "(i) any person or organization that is a member of any Federal credit union as of August 7, 1998 may remain a member of the credit union after August 7, 1998"; and "(ii) a member of any group whose members constituted a portion of the membership of any Federal credit union as of August 7, 1998 shall continue to be eligible to become a member of that credit union, by virtue of membership in that group after August 7, 1998." 12

U.S.C. § 1759(c)(1)(A)(i) and (ii). The Administration interprets the grandfather clause to permit persons who are members of a group that was part of a credit union as of August 7, 1998, the date the 1998 Amendments were enacted, to join the credit union even if they didn't become group members until after that date. *See* 63 Fed.Reg. at 72,015 (grandfather provision applies to "a member, or subsequent new member, of any group, whose membership constituted a portion of the membership of any federal credit union at the date of enactment"). Disagreeing, the ABA argues that the clause's plain language permits only persons who were group members as of August 7, 1998, to join because only they could "continue to be eligible" to become credit union members. 12 U.S.C. § 1759(c)(1)(A)(ii).

The ABA's interpretation is certainly plausible. But when we read the grandfather clause in its entirety, as we must, *see Brown and Williamson,* 529 U.S. at 120, 120 S.Ct. 1291 (noting that statutory words and phrases should be read in context), its meaning is not so clear. The grandfather clause's first part—referring to "a member of any group whose members constituted a portion of the membership of any Federal credit union as of August 7, 1998," 12 U.S.C. § 1759(c)(1)(A)(ii)—suggests, as the Administration argues, that its scope turns not on whether the *individual* was a group member as of August 7, 1998, but on whether the *group* was part of a credit union as of that date. Indeed, if individuals needed to be group members on the date the FCUA was amended, the phrase "as of August 7, 1998" would follow the words "a member of any group."

According to the ABA, the Administration's interpretation of the grandfather clause "has the effect of reading the word 'continue' out of the statute." Appellant's

Reply Br. at 16. We disagree. The Administration plausibly interprets this word to refer to any member of a group that was part of a credit union as of August 7, 1998. To use the statute's language, if a group's "members constituted a portion of the membership of any federal credit union as of August 7, 1998," 12 U.S.C. § 1759(c)(1)(A)(ii), then the group's members, whether they became members before or after August 7, 1998, shall "continue" to be eligible for credit union membership.

Faced with two plausible interpretations of the grandfather clause, we may examine its legislative history, *see Browner,* 57 F.3d at 1126–29 (considering legislative history at *Chevron* step one), and that history definitively resolves the debate over the grandfather clause's meaning in the Administration's favor. The House Report explains that the "broad grandfather" clause "covers all persons or organizations or successors who were members of a federal credit union on the date of enactment of this Act, as well as anyone who is or becomes a member of a group representing a portion of the credit union's membership," H.R. REP. No. 105–472, at 19 (1998), U.S. Code Cong. & Admin. News at 334, and "[the provision] grandfathers all current members as well as current groups contained within the membership of a credit union as of the date of enactment of this legislation. The grandfather [provision] will permit such groups to continue accepting new members," *id.* at 11. The Senate Report makes the same point, stating that the clause includes "all current members as well as current groups.... The grandfather provision also permits such groups to continue adding new members." S. REP. No. 105–193, at 3–4 (1998). As the district court put it, this legislative history is "pellucid" on the issue. *Am. Bankers Ass'n v. Nat'l Credit Union Admin.,* 38 F.Supp.2d 114, 134 (D.D.C.1999).

IV.

■ The ABA's next challenge focuses on the FCUA's requirement that in order for a group to be added to a credit union, the group must be within "reasonable proximity" of that credit union. 12 U.S.C. § 1759(f)(1)(B). The rule defines "reasonable proximity" as "within the service area of a service facility of the credit union." 63 Fed.Reg. at 72,002. Although the rule defines a "service facility" as "a credit union owned electronic facility" at which the credit union member is "able to deposit funds, apply for a loan, and obtain funds on approved loans," the rule "excludes ... ATMs." *Id.* at 72,003. Claiming that an "electronic facility" is similar to an ATM, and that the legislative history of the 1998 Amendments shows that "Congress did not intend for devices similar to ATMs to be considered 'service facilities,'" Appellant's Opening Br. at 37, the ABA argues that the Administration's definition violates the statute. Defending its rule, the Administration argues that the legislative history deals with the term "facility" in the context of a different statutory provision, that *Chevron* step two applies because the FCUA nowhere defines "reasonable proximity," and that the agency's interpretation is reasonable.

Although the parties obviously feel strongly about this issue—they devoted nine pages of briefing to it—not one has identified an "electronic facility" that is not also an ATM. The rule doesn't define "electronic facility"; the briefs never define it; and when asked at oral argument, neither counsel could define it, much less tell us whether non-ATM electronic facilities even exist. Under these circumstances, this issue is plainly unripe for judicial review. *See Abbott Labs. v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18

L.Ed.2d 681 (1967) (ripeness requires that issue be fit for judicial decision); *Louisiana Envtl. Action Network v. United States Envtl. Prot. Agency,* 172 F.3d 65, 69 (D.C.Cir.1999) (issue not fit for judicial decision where its "[c]onsideration ... would benefit from a more concrete setting").

### V.

The ABA raises several other challenges to the rule's provisions governing multiple common-bond credit unions. None has merit.

■ First, the ABA argues that the Administration's criteria for determining when a group with 3000 or more members "could not feasibly or reasonably establish a new single commonbond credit union," 12 U.S.C. § 1759(d)(2)(A), and may therefore join an existing credit union, violate the FCUA because the Administration considers the group's "desire and intent" to be "[i]mportant" and "key" in this analysis, 63 Fed.Reg. at 72,002, 72,010. According to the ABA, the statutory phrase "feasibly or reasonably" requires the Administration to determine independently whether the group could operate its own credit union, but the rule "essentially ... allows the group itself to decide whether it will be allowed to join an existing credit union." Appellant's Opening Br. at 25. The rule specifies, however, that "the intent of the group ... [is] *not the sole factor*[ ]. The final decision must be based on an independent regulatory analysis in consideration of the remaining factors in the regulation." 63 Fed.Reg. at 72,002 (emphasis added). Those remaining factors include "the volunteers and resources to support the efficient and effective operations of the credit union, whether the group meets the economic advisability criteria and the demographics of the group." *Id.* at 72,010.

■ Second, the ABA challenges the portion of the rule that permits voluntary mergers between healthy multiple common-bond credit unions comprised of groups with fewer than 3000 members "without regard to the statutory requirements for non-affiliated groups of [this size] ... seeking to join an existing credit union." 63 Fed.Reg. at 72,003. These requirements, which apply to multiple common-bond credit union "expansions," include a provision directing the Administration to "encourage the formation of separately chartered credit unions," the "reasonable proximity" requirement, and the "approval criteria" for credit unions seeking to include new groups. 12 U.S.C. § 1759(f). The ABA argues that these requirements "apply on their face whenever a credit union seeks to expand its field of membership by adding new groups—including when it does so through merger." Appellant's Opening Br. at 30. This argument suffers from an obvious defect: Several of the requirements set forth in the "expansions" subsection make no sense in the case of mergers. For example, how can the Administration "encourage the formation of separate credit unions," since mergers, by definition, bring together already-formed credit unions? Or why would Congress have written the "approval criteria" in the singular—"the credit union has not engaged in any unsafe or unsound practice," "is adequately capitalized," and "has the administrative capability ... and the financial resources ... to serve the new membership group," 12 U.S.C. § 1759(f)(2)—if it had intended them to apply to mergers of two credit unions? Contrary to the ABA's argument, therefore, subsection 1759(f) does not unambiguously apply to mergers.

■ Third, the ABA challenges the requirement that groups with fewer than

3000 members "demonstrate why they can successfully operate a credit union" in order to obtain a separate charter. 63 Fed. Reg. at 72,001. According to the ABA, this provision violates the FCUA's requirement that the Administration "encourage the formation of separately chartered credit unions." 12 U.S.C. § 1759(f)(1)(A). Yet the statute only requires the Administration to encourage groups to form their own credit unions "whenever practicable and consistent with reasonable standards for the safe and sound operation of the credit union." *Id.* Requiring that smaller groups show they can operate their own credit unions safely is entirely consistent with this requirement.

## VI.

We turn finally to the ABA's challenges to the Administration's approach to the chartering of community credit unions. Pointing out that Congress added the word "local" to the "well-defined community, neighborhood, or rural district" community credit union definition, the ABA argues that although Congress intended the Administration to take a more restricted approach to community credit union charters, the new rule is either the same as, or in some instances, less restrictive than, the prior rule. In support of this proposition, the ABA cites two provisions of the rule: the criteria for determining whether a community qualifies for a charter, *see* 63 Fed.Reg. at 72,038, and the new "presumptive community" standard applicable to a recognized political jurisdiction with no more than 300,000 residents, or multiple contiguous political jurisdictions with no more than 200,000 residents, *see* 63 Fed.Reg. at 72,013, 72,037–38. The ABA contends that the community credit union criteria are substantially unchanged. *Compare* 63 Fed.Reg. at 72,038 (new rule listing political jurisdictions, major trade areas, shared/common facilities, organizations/clubs, newspapers/other periodicals,

maps designating community to be served, common characteristics and background of residents, and other documentation demonstrating common interests or interaction) *with* 59 Fed.Reg. at 29,077 (former rule listing political jurisdictions, major trade areas, shared/common facilities, organizations/clubs, newspapers/other periodicals, census tracts, common characteristics and background of residents, history of area, and other evidence of what distinguishes chosen area and its residents). The ABA also points out that an area benefitting from the "presumptive community" standard is subject to less demanding documentation requirements than ordinarily apply to an area seeking a credit union charter. *See* 63 Fed.Reg. at 72,013, 72,037–38.

Keeping in mind that the ABA limits this appeal to *Chevron* step one, we have little difficulty rejecting these arguments. To begin with, the Administration acknowledges in the rule itself that the addition of the word "local" reflects congressional intent that it take "a more circumspect and restricted approach to chartering community credit unions." 63 Fed. Reg. at 72,012. Moreover, although the Administration left the community credit union criteria substantially unchanged, it has made clear that it intends to apply them more stringently. Specifically, where a community tests the limits of the statutory standard, the Administration will require it "to demonstrate more definitively how it meets the local requirement." *Id.* at 72,012; *see also id.* at 72,037–38 (more documentation required for larger or more densely populated areas). And although the Administration adopted a new presumption, the rule not only requires documentation "describing how the area meets the standards for community interaction or common interests," but also makes clear that the Administration reserves the right to request additional evidence of community interaction or common

interests when the community's initial submission falls short. *See id.* at 72,038. At least on its face, therefore, the rule adopts a more circumspect method for applying the community credit union criteria.

 The ABA also argues that because the rule provides that the Administration will consider an area's "primary ethnic composition" in determining whether it qualifies as a "well-defined local community," 63 Fed.Reg. at 72,038, the rule violates the Fifth Amendment, the FCUA, and the Equal Credit Opportunity Act, 15 U.S.C. § 1691(a)(3). The district court dismissed this claim, concluding that the ABA, having failed to allege injury to itself, lacked Article III standing. In the alternative, the court held that the consideration of ethnicity in the chartering process violates none of the cited statutory or constitutional provisions. *See Am. Bankers,* 93 F.Supp.2d at 48. The Administration argues that this issue has now become moot because it deleted the ethnicity provision from the rule during the pendency of this appeal. *Compare* 63 Fed.Reg. at 72,038 (final rule) *with* 66 Fed.Reg. 15,619, 15,620 (March 20, 2001) (amending final rule). Although the ABA insists that we should nonetheless "declare [the] policy unlawful to prevent the [Administration] from returning to it," Appellant's Reply Br. at 21, we think the Administration has met its burden to show mootness: It has eliminated the allegedly unlawful provision and "there is no indication [it] will revert to its past [policy]." *Arizona Pub. Serv. Co. v. EPA,* 211 F.3d 1280, 1295–96 (D.C.Cir. 2000) (holding that challenge to EPA rule was moot where agency issued clarification modifying challenged provision); *see Nat'l Mining Ass'n v. United States Dep't of Interior,* 251 F.3d 1007, 1011 (D.C.Cir. 2001) (holding that challenge to National Mining Association regulations was moot where agency adopted new regulations eliminating challenged provisions); *Motor & Equip. Mfrs. Ass'n v. Nichols,* 142 F.3d 449, 458–59 (D.C.Cir.1998) (holding that EPA met " 'heavy' burden" to show that challenge to EPA waiver for state regulatory program was moot to extent state had eliminated allegedly unlawful regulations) (quoting *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979)).

### VII.

The ABA's challenge to the "reasonable proximity" requirement is dismissed as unripe. Its challenge to the ethnicity provision is dismissed as moot. In all other respects, the decision of the district court is affirmed.

*So ordered.*