WILKINS, Circuit Judge,
concurring in part and dissenting in part:
I must depart from the Court’s opinion concluding that Section 612 of the Clean Air Act unambiguously prohibits EPA from requiring the replacement of HFCs, The majority claims that “EPA’s novel reading of Section 612 is inconsistent with the statute as written,” because Section 612 does not provide EPA with the authority to require “manufacturers to replace non-ozone-depleting substances such as HFCs.” Maj. Op. 454. Accordingly, the majority disposes of the issue in a Chevron step-one analysis through an interpretation of the word “replace.” See id. at 456-59.1 disagree. The bar for deciding a case at Chevron step one is high, requiring clear and - unambiguous congressional intent. See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Because the term “replace” is susceptible of multiple interpretations in this context, it cannot serve as the basis for discerning clear congressional intent. See, e.g., U.S. Postal Serv. v. Postal Regulatory Comm’n, 640 F.3d 1263, 1267 n.4 (D.C. Cir. 2011) (“Our second inquiry will require us to proceed to Chevron step 2 because the phrase ‘due to’ has an additional—and ambiguous— meaning, which the Commission did not address,”). Thus, the Court must proceed to Chevron step two and decide whether *465 EPA’s interpretation of the statutory scheme is reasonable. Because I find that it is, I would deny the petition on all grounds.
I.
We review EPA’s interpretation of the Clean Air Act under the two-step framework established in Chevron. See Catawba Cnty., N.C. v. EPA, 571 F.3d 20, 35 (D.C. Cir. 2009). Pursuant to step one of the Chew-on analysis, “both the agency and the courts [must] give effect to Congress’s unambiguously expressed intent if the underlying statute speaks directly to the precise question at issue.” Citizens of Coal Council v. Norton, 330 F.3d 478, 481 (D.C. Cir. 2003). In other words, “if the intent of Congress is clear and unambiguously expressed by the statutory language at issue, that would be the end of our analysis.” Zuni Pub. Sch. Dist. No. 89 v. Dep’t of Educ., 550 U.S. 81, 93, 127 S.Ct. 1534, 167 L.Ed.2d 449 (2007). When making this determination, we may rely on the traditional tools of statutory interpretation, including the statute’s text, structure, purpose, and legislative history. Citizens of Coal Council, 330 F.3d at 481.
I respectfully disagree with the majority that the relevant language in Section 612 meets the Chevron step one standard. This is simply not a case where Congress has clearly and directly spoken to the issue in a manner that “unambiguously foreclosed the agency’s statutory interpretation.” Catawba Cnty., 571 F.3d at 35.
The majority focuses, primarily upon two provisions of Section 612 as clearly and unambiguously demonstrating that the 2015 Rule was not authorized by Congress. Here are the two provisions:
To the maximum extent practicable, class I and class II substances shall be replaced by chemicals, product substitutes, or alternative manufacturing processes that reduce overall risks to human health and the environment.
42 U.S.C. §' 7671k(a) (emphasis' added).
Within 2 years after November 15,1990, the Administrator shall promulgate rules under this section providing that it shall be unlawful to replace any class I or class II substance with any substitute substance which the Administrator determines may present adverse effects to human health or the environment, where the Administrator has identified an alternative to such replacement that—
(1) reduces the overall risk to human health and the environment; and
(2) is currently or potentially available.
The Administrator shall publish a list of (A) the substitutes prohibited under this subsection for specific uses and (B) the safe alternatives identified under this subsection for specific uses.
Id. § 7671k(c) (emphasis added).
The majority contends that the word “replace,” when used in these two provisions, can have only one meaning: to “take the place of.” Maj. Op. 458-59; see id. at 459 (“In common parlance, the word ‘replace’ refers to a new thing taking the place of the old.”). Under this definition, a substitute can only “replace” an ozone-depleting substance once. After the manufacturer has transitioned from an ozone-depleting substance to a non-ozone-depleting substitute, there is nothing left to “replace.” Id. While the majority’s definition may be one way to interpret the statute, for several different reasons, it is by no means the only way to construe the text.
First, with respect to the plain text of the statute, the meaning of the word “replace” ⅛ ambiguous. Nowhere in Section 612 is the term “replace” statutorily defined. See 42 U.S.C. § 7671 (definitions). *466 The majority does not disagree, and instead relies' on dictionary definitions to conclude that “replace” means to “take the place of.” Maj. Op. 458-59. However, each of the dictionaries cited by the majority also defines “replace” to mean to “substitute for.” See The American Heritage Dictionary op the English Language (5th ed. 2017 online) (“To fill the place of; provide a substitute for”); Webster’s Third New International Dictionary 1925 (1993) (“[T]o take the place of: serve as a substitute for or successor of’); The Oxford English Dictionary 642 (2d ed. 1989) (“To take the place of, become a substitute for (a person or thing).”).
The difference in meaning between “to take the place of’ and “to provide a substitute for” may be subtle, but it is rather significant in the context of this statute. Section 612 pertains to replacing a category, or class, of chemical substances; indeed the substances are defined in the statute as “class I” and “class II” substances. 42 U.S.C. § 7671(3), (4). Thus, this statute is not directed to a specific individual or position, and the majority’s example noting that “President Obama replaced President. Bush at a specific moment in time,” Maj. Op. 459, is therefore inappo-site. A more pertinent example would be: “Hybrid electric engines, fully electric engines, hydrogen fuel cell power, and other alternatives are replacing the internal combustion engines in passenger cars.” The Oxford Dictionary provides a similar example sentence: “This is required to replace older medicines that will eventually face competition from generic substitutes.” Replace, Oxford Dictionary, https://en.oxforddictionaries.com/definition/ replace (last accessed July 14, 2017). In both examples, the ubiquitous product that has become the industry standard is “replaced” by a number of substitutes, and the replacement takes place not.at a specific point in time, not just once, and not by a single substitute. Instead, the ubiquitous item is “replaced” by any number of substitutes over the course of years, and it may be, the case that one substitute is succeeded by a better substitute at some point in time. As one dictionary, puts it, “Replace applies both to substituting something new or workable for that which is lost, depleted or won out and to placing another in the stead of one. who leaves or is dismissed from a position.” American Heritage Dictionary (2d Coll. ed. 1982).
Second, the structure of the statutory text also contradicts the clear meaning proffered by the majority. The two key provisions of Section 612 are not directed to any particular group of individuals or class of companies. They provide that “class I and class II substances shall be replaced by chemicals, product substitutes, or alternative manufacturing processes,” 42 U.S.C. § 7671k(a), and that “it shall be unlawful to replace any class I or class II substance with any substitute substance,” id. § 7671k(c). These Congressional mandates, written in the passive voice and without identifying a particular target of the regulation, appear to apply to anyone and everyone, including retailers, product manufacturers and chemical manufacturers.[1] The majority focuses on product man *467 ufacturers, contending that once the manufacturer replaces the class I or class II substance in its product with a non-ozone-depleting substitute, “the replacement has been effectuated.” Maj. Op. 459.
However, this point of view ignores, the retailer. Suppose a retailer, needs to refurbish an air conditioner manufactured in the early 1990s that uses a class I substance as a refrigerant. If the retailer chooses to have the air conditioner serviced by recharging it with new refrigerant, she is prohibited from “replacing” the class I substance with a chemical substitute “which the Administrator determines may present adverse' effects to human health or the environment[,]” 42 U.S.C. § 7671k(a). If the retailer chooses to purchase a new air conditioner instead, she is still “replacing” a class I substance, and the new air conditioner cannot contain an unsafe substitute.' Id. Either way, the retailer’s action falls within the scope of the mandates in Section 612. And if the retailer purchases a new air conditioner, the fact that the manufacturer may have previously “replaced” a class I substance with an HFC as the refrigerant in its air conditioners does not mean that “the replacement has [already] been effectuated” with respect to that retailer. See Maj. Op. 459. By the express terms of the statute, if the EPA determines as of 2017 that HFCs are no longer safe substitutes for .class I substances given available refrigerant alternatives, it would appear that Congress has given EPA the authority to prohibit the further use of HFCs in air conditioners so that the retailer in our example cannot “replace” her class I substance-utilizing air conditioner with a new air conditioner utilizing an -unsafe substitute. The majority holds otherwise. Alternatively, the express terms of the statute appear to give EPA the authority to prohibit the retañer from recharging her old air conditioner with an HFC as the refrigerant, which the agency could implement by restricting the manufacture, marketing, and use of HFCs. Given its focus on product manufacturers, the majority opinion is curiously silent about how its statutory interpretation affects retailers and other end users who have products utilizing class I ’ and class II substances, despite the obvious importance of the issue.
In my view, the connotation of “replace” as “to provide a substitute for” more accurately reflects the intent of Congress given the use of the term and sentence structure in the key statutory provisions. This interpretation is further supported by the fact that Congress used the word “substitute” ten separate times in Section 612, and the word “alternative” a dozen times more, including in the title of the section. See 42 U.S.C. § 7671k (“Safe Alternatives Policy”). In that context, “replacing” the class I or class II substance is not necessarily a one-time event and alternatives or substitutes can be deemed replacements or successors, even if they are not the first-generation successor. At a minimum, the definition of “replace” is ambiguous, and “to provide a substitute for” just as likely manifests Congress’s intent as the definition proffered by the majority. “Confronted by two plausible readings of thé statute, we cannot declare Congress’ intent unambiguous.” Adirondack Med. Ctr. v. Sebelius, 740 F.3d 692, 698 (D.C. Cir. 2014).
Third, the majority’s interpretation also undermines the purpose of Section 612, which is, “[t]o the maximum extent practicable,” to carry out the replacement of class I and class II substances with “chemicals, product substitutes, or alternative manufacturing processes that reduce overall risks to human health and the environment.” 42 U.S.C. § 7671k(a). Significantly, Congress authorized EPA .to develop a list of unsafe alternatives and a list of safe alternatives, but Congress chose, for whatever reason, only to bar the use.of al *468 ternatives on the “unsafe list,” rather-than mandating the use of only those alternatives appearing on the “safe list.” See id. § 7671k(c) (“it shall be unlawful to replace any class I or class II substance with any substitute substance which the Administrator determines may present adverse effects to human health or the environment”). By writing the statute in this mánner, Congress' allowed manufacturers to replace class I and II substances with alternatives that have not been specifically approved by the EPA, so long as the substitute has not been specifically deemed unsafe by the EPA. The majority’s interpretation of “replace” makes a mockery of the statutory purpose, because a product manufacturer could “replace” a class I substance with a substitute before the EPA has a chance to evaluate it completely, and if the agency later determines that a different substitute “reduce[s] overall risks to human health. and the environment,” id. § 7671k(a), the agency would be powerless to tell that product manufacturer that it could no longer use the more risky substitute. In the majority’s view, the “replacement” is a fait accompli, and EPA is powerless to act under Section 612. Such an interpretation undermines Congress’s intent to “reduce overall risks to human health and the environment” in a manner “to the maximum extent practicable.” Id.
In doing so, the majority takes an even more extreme position than petitioners, who conceded that “if ozone-depíeting substances are in use, EPA cari list and de-list” to and from the lists of acceptable and unacceptable ‘ alternatives. Oral Arg. at 11:07, Mexichem Fluor, Inc. v. EPA (Feb. 17, 2017) (No. 15-1328). According to petitioners, EPA “can list or de-list ozone-depleting substances and non-ozone-'depleting substances because the list at that point is consisting of things that mil replace the things that are in use, which are ozone-depleting substances Id. at 11:14 (emphasis added). The petitioners are at least trying to interpret “replace” in a manner consistent with the statutory purpose—but as explained infra in part II, they are simply wrong on the facts, because ozone-depleting substances are still in use. The majority’s definition of “replace,” on the other hand, has no semblance of consistency with this aspect of Congress’s purpose.
Indeed, Section 612 is aimed at regulating which substitutes can be used as replacements for class I and class II substances, rather than regulating those ozone-depleting substances themselves. Congress phased out the production and manufacture of ozone-depleting substances in other statutory provisions. See 42 U.S.C. §§ 7671c, 7671d. Section 612, on the other hand, is focused solely on substituting class I and class II substances with safe alternatives. See id. § 7671k. Because Section 612 promotes the use of safe substitutes, it necessarily requires a reading of the word “replace” that comports with this congressional intent. The majority’s cramped reading of the statute contradicts Congress’s intent, that the EPA prohibit the use of “any substitute substance” that may “present adverse effects to human health and the environment” where a less risky substitute is available. Id. § 7671k(c) (emphasis added).
Moreover, the majority’s interpretation also runs counter to the purpose of the petition process contained in Section 612. Congress provided that “[a]ny person may petition , the Administrator to add a substance to the [safe or unsafe alternatives] lists ... or to remove a substance from either of such lists.” Id. § 7671k(d). The petition process becomes a half-measure if EPA is only allowed to “replace” an ozone-depleting substance once and only once. The- majority’s interpretation grants EPA one bite at the apple, prohibiting additions *469 to the unsafe substitutes list or removals from the safe substitutes list if the product manufacturer has already begun using a non-ozone-depleting substitute for the class I or. class II substance. By creating this petition process, it is evident that Congress desired the safe alternatives list to be a fluid and evolving concept that promotes those alternatives that ■ pose the least overall risk to human health and the environment. Congress undoubtedly knew how to instruct EPA to develop a list of acceptable and unacceptable substitutes by a certain date and then stop there. The fact that Congress did not do'so is telling. See City of Arlington, Tex. v. FCC, 569 U.S. 290, 138 S.Ct. 1863, 1868, 185 L.Ed.2d 941 (2013) (“Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion.”). Congress chose a starkly different path, and the majority has taken the power that Congress granted individuals to request the addition of more risky substitutes to the unsafe list and rendered it largely impotent. When interpreting two interrelated statutory provisions, “[a]bsent clearly expressed congressional intent to the contrary, it is our duty to harmonize the provisions and render each effective.” Adirondack Med. Ctr., 740 F.3d at 698-99.
Fourth, the majority’s references to EPA’s prior interpretations of its statutory authority cannot change the Chevron step one analysis. See Maj. Op. 457-58.1 agree with the majority that we must reject any EPA interpretation of “replace” if we determine that Congress has clearly and directly spoken to the contrary, because “[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.” Chevron, 467 U.S. at 843 n.9, 104 S.Ct. 2778. But the EPA’s interpretations of the statute are not themselves suitable evidence of Congress’s clear intent. See Village of Barrington, Ill. v. Surface Transp. Bd., 636 F.3d 650, 660 (D.C. Cir. 2011); see also Kentuckians for Commonwealth Inc. v. Rivenburgh, 317 F.3d 425, 443 (4th Cir. 2003) (“Agency interpretations of statutory provisions only come into play if Congress has not spoken clearly. -Relying on agency interpretations as evidence of a clear congressional intent is therefore misguided.” (emphasis in original)).
Finally, an examination of Section 612’s legislative.history does not-change the outcome. Where “a statute is silent or ambiguous with respect to the question at issue,” we must “defer to the ‘executive department’s construction of a statutory scheme it is entrusted to administer,’ unless the legislative history of the enactment shows with sufficient clarity that the agency construction is contrary to the will of Congress.” Japan Whaling Ass’n v. Am. Cetacean Soc., 478 U.S. 221, 233, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986) (quoting Chevron, 467 U.S. at 844, 104 S.Ct. 2778 (emphasis added, citation omitted)). In other words, “conflicting [legislative history] cannot clarify ambiguous statutory language,” Am. Bankers Ass’n v. Nat’l Credit Union Admin., 271 F.3d 262, 269 (D.C. Cir. 2001), and “[w]hile [legislative] history can be used to clarify congressional intent even when a statute is superficially unambiguous, the bar is high,” Williams Companies v. FERC, 345 F.3d 910, 914 (D.C. Cir. 2003).
Here, the legislative history cited by the majority cannot meet the required high bar to show clear Congressional intent, particularly since the legislative activity “was not ... addressed to the precise issue raised by th[is] case[].” Chevron, 467 U.S. at 853, 104 S.Ct. 2778. The precise question presented here is whether “Section 612 unambiguously covers only replacements of ozone-depleting substances and does not authorize ‘replace- *470 merits of replacements’.” Pet’rs’ Br. 29. The Senate bill cited by the majority had no provisions whatsoever regarding how replacements of .covered substances were to be carried out.. Instead, the Senate bill would have phased out production entirely of not only ozone-depleting substances, but also certain substances which were known or reasonably suspected to contribute to “atmospheric or climatic modification.” S. 1630, 101st Cong. §§ 504, 506 (as passed by Senate, Apr. 3, 1990). But the Senate bill had no provisions for creating a list of acceptable substitutes or for prohibiting unacceptable substitutes; nor did it have any provisions for adding substitutes to, or removing substitutes from, the “acceptable” and “unacceptable” lists. Instead, the Senate bill directed EPA to support programs to identify and promote the development, of safe alternatives and to maintain a public clearinghouse of “available” alternatives. Id. § 514. All of the statutory provisions in Section 612 concerning acceptable and banned alternatives originated in the House bill. S. 1630, 101st Cong. § 156 (1990). (as passed by House, May 23,1990). At best, this legislative history shows that Congress rejected a proposal to ban and phase out the production of substances that contribute to climate change. However, the history is silent on the much different question of whether Congress intended to allow EPA to make “replacements of replacements” of the substitutes for banned ozone-depleting substances. Because “the legislative history as a whole is silent on the precise issue before us,” Chevron, 467 U.S. at 862, 104 S.Ct. 2778, it cannot demonstrate clear congressional intent on that question.
* * ⅜
Given my interpretation of Section 612’s plain language, purpose, and legislative history, I cannot agree with my colleagues that the word “replace” clearly and unambiguously means to “take the place of,” and only permits a one-time replacement of ozone-depleting substances. Rather, at a minimum, sufficient ambiguity exists to proceed to Chevron step two. See, e.g., NRDC v. EPA, 22 F.3d 1125, 1138 (D.C. Cir. 1994) (“Because the phrase ‘take effect’ is itself ambiguous, its meaning must be discerned according to Chevron’s second step.”).
II.
The second step in the Chevron framework requires courts to grant deference to an administrative agency’s construction of an ambiguous statute if that interpretation is reasonable. Chevron, 467 U.S. at 843, 104 S.Ct. 2778. “[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.” Id. Where the interpretation would be one Congress could have sanctioned, the administrative agency is entitled to deference and its construction should be afforded “considerable weight.” Id.
For the reasons discussed in Part I, I find EPA’s interpretation of Section 612 to be reasonable. EPA’s interpretation comports with a common definition of the word “replace,” which is to “[pjrovide a substitute for.” See, e.g., Replace, Oxford Dictionary, supra. This meaning of “replace” is consistent with Section 612’s statutory purpose, which is, “to the maximum extent practicable,” to replace ozone-depleting substances with “chemicals, product substitutes, or alternative manufacturing processes that reduce overall risks to human ..health and the environment.” 42 U.S.C. § 7671k(a)(emphasis added). Comparing alternatives to each other and selecting the alternative that creates the lowest level of overall risk to human health and the environment accords nicely with the policy choice explicitly stated by Congress. EPA’s interpretation further avoids the *471 maj 01¾⅛ manufacturer-by-manufacturer structure, which does not fully comport with the statutory framework.
Finally,-I do not read the administrative record in the same manner as the majority. EPA never stated that regulation of non-ozone-depleting substitutes was completely off limits, nor clearly acted in a manner to foreclose its present interpretation.
The past language of EPA that is relied upon by the majority is far from conclusive on the meaning of “replace” in this context. It is true that EPA stated in the course of the 1994 rulemaking that “Section 612(c) authorizes EPA to review all substitutes to Class I and II substances, but does not authorize EPA to review substitutes for substances that are not themselves class I or II substances.” J.A. 50. But this excerpt alone does not tell the whole story. At the time, several commen-ters requested that “EPA clarify that SNAP should only apply to substitutes for Class I or Class II compounds,” while another commenter suggested “that SNAP should aggressively reevaluate previously approved second-generation alternatives as new and environmentally preferable alternatives are developed.” Id. EPA began its response to these comments as follows:
A key issue is whether there exists a point at which an alternative should no longer be considered a class I or II substitute as defined by Section 612. The Agency believes that as long as class I or II chemicals are being used, any substitute designed to replace these chemicals is subject to review under Section 612.
J.A. 50 (emphasis added). This statement by the agency is consistent with how it has construed “replace” in the.2015 Rule,
Furthermore, EPA’s seemingly contradictory statement relied upon by the majority must be placed in context. In Section 612, Congress specified that producers of chemical substitutes for class I substances are required “to provide the Administrator with such person’s unpublished health and safety studies on such substitute and require producers to notify the Administrator not less than 90 days before new or existing chemicals are introduced into interstate commerce fór significant new uses as substitutes for a' class I substance.” 42 U'.S.C, § 7671k(e). This advance reporting requirement gives the agency a 90-day period to review the chemical substitute and related data and make a determination as to whether it is a safe, alternative or unsafe 'alternative for a class I or class II substance before the substitute hits the marketplace.[2] The EPA and the National Resources Defense Council conténd that EPA’s 1994 comment only pertained to the 90-day advance reporting—and concomitant—review requirements of the SNAP program. Resp’t’s Br. 6; NRDC Interve-nor’s Br. 13. Thus, when the agency stated that “Séction 612(c) authorizes EPA to’ review all substitutes to Class I and II substances, but does not authorize EPA to review substitutes for substances that are not themselves class I or II substances,” J.A. 50, EPA argues it meant only that 1) it could not require 90-day advance reporting of intended use and'health data for certain second-generation substitutes by *472 chemical manufacturers, and 2) the agency was not required to conduct an advance review before any such second-generation substitute hit the market. Thus, EPA contends that it never said, or meant to say, that EPA had no power whatsoever to review second-generation substitutes, either in response to a petition or on the agency’s own accord. While the back and forth in the commentary during the 1994 rulemaking is not crystal clear, it appears to support the interpretation that EPA only intended to disclaim authority to “review” second-generation substitutes in the 90-day advance notification and review context, and only if the first-generation substitute was a non-ozone-depleting substance. See id. (“For example, if a hydro-fluorocarbon (HFC) is introduced ás a first-generation refrigerant substitute for either a class I (e.g., CFC-12) or class II chemical (e.g., HCFC-22), it is subject to review and listing under section 612. Future substitutions to replace the HFC would then be exempt from reporting under section 612 because the first-generation alternative did not deplete stratospheric ozone.” (emphasis added)).[3]
The majority also relies upon EPA’s statement in response to a 1995 petition by OZ Technology, Maj. Op. 457-58, but there the EPA appears to have disclaimed regulatory authority under SNAP if the substance is being proffered as a “legitimate substitute]” for a non-ozone-depleting substance, rather than as a substitute for a class I or class II ozone-depleting substance. J.A. 145, 412. EPA exerted regulatory authority over the petition because it found that OZ Technology submitted its proposed alternative as a substitute for CFC-12, an ozone-depleting substance, rather than as a substitute to HFC-134a, a non-ozone-depleting substitute. J.A. 412, 415. This course of events seems to be consistent with the agency’s position here. At any rate, petitioners concede - that the HFCs they manufacture are- substitutes for CFCs, which are ozone-depleting substances. Thus, petitioners do not stand in the same shoes as OZ Technology and they have not identified any statements where EPA has disclaimed authority to regulate HFCs or other direct substitutes for ozone-depleting substances such as CFCs.
I understand (and share) the majority’s concern that the Clean Air Act does not grant EPA the authority to take a completely unbounded approach and thereby regulate “substitutes” for class I and class II substances forever! In my view, the regulation of substitutes under Section 612 requires that the traditional and ubiquitous ozone-depleting substance originally utilized for the specific end-use is still in service.- Without the prerequisite of an ozone-depleting substance, there can be nothing for the substitute to “replace.” In other words, where ozone-depleting chemicals are no longer in existence or in use for a particular industry or end-use, then EPA cannot regulate substitutes for those end-uses under Section 612.
Here, petitioners claim that “class I and class II substances have already been replaced” with respect to the 25 end-uses addressed in the 2015 Rule. Pet’rs’ Br, 20. In support of this assertion, Petitioners rely on two examples. First, Petitioners state that in the motor-vehicle air conditioning sector, CFC-12, which is an ozone-depleting substance, had historically been *473 used. Id. However, Petitioners claim that the record shows that by the mid-1990s, use of CFC-12 in the manufacture of new cars stopped in the United States, and manufacturers uniformly adopted HFC-134a as a substitute. Id. This statement is true as far as it goes, but it does not show that ozone-depleting substances are not still in use in the motor-vehicle air conditioning sector. Indeed, the record confirms “some older vehicles may still be using CFC-12.” J.A. 815. Thus, we cannot conclude that ozone-depleting substances are not still in “use” in this sector.
Second, Petitioners reference the commercial refrigeration industry, arguing that because the commercial refrigeration industry has “transitioned away” from ozone-depleting substances, such substances are no longer in use in this sector. See Pet’rs’ Br. 21; • J.'A. 528. This argument suffers from the same flaw as the motor-vehicle air conditioning argument. The fact that modern commercial refrigeration systems may not use ozone-depleting chemicals does not mean that older refrigeration systems do not continue to use such substances, and the record indicates that ozone-depleting substances remain, in “use” in the commercial refrigeration industry. J.A. 535. With respect to the other 23 challenged end-uses, Petitioners are silent, and offer no support to prove that ozone-depleting substances have been completely eliminated in those sectors.
EPA responds to Petitioners’ claim, arguing that “ozone-depleting substances are still being directly ‘replaced’ by approved alternatives,” Resp’t’s Br. 21 n.8, and that “as long as ozone-depleting substances are being used, any substitute designed to replace these chemicals is subject to review” under Section 612, id. at 31 (alterations omitted). While EPA acknowledges that “in some cases the use of ozone-depleting substances has ceased,” it contends that ozone-depleting substances have not been completely eliminated such that a “second-generation substitute, world” exists. Id. Petitioners failed to respond to this argument in their reply brief. Given that the burden is on Petitioners to demonstrate that EPA’s interpretation of Section 612 is unreasonable- or statutorily impermissible with respect to these 25 end-uses, they have failed to show that the agency’s policy choice “runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.” Mtr. Vehicle Mfrs. Ass’n of the U.S., Inc. v. State Farm Mut. Auto. Ins., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).
⅜ ⅝ ⅝
In sum, I disagree -with' the majority’s holding in Part II, and concur with all remaining parts. I would find the word “replace” sufficiently ambiguous to require a Chevron step two analysis. Because I find that EPA’s interpretation of Section 612 is reasonable, I would deny the petition for review on all grounds.

. In other provisions of Section 612, Congress identified the target of the. regulation as chemical manufacturers, like the petitioners in this case. See, e.g., 42 U.S.C. § 7671(e) (“The Administrator shall require any person who produces a chemical, substitute for a class I substance to provide the Administrator with such person's unpublished' health and safety studies on such substitute and require producers to notify the Administrator not less than 90 days before new or existing chemicals are introduced into interstate commerce for significant new uses as substitutes for a class I substance.” (emphasis added)); see also id. § 7671(11) (defining "produce” as "the manufacture of a substance from any raw material or feedstock chemical .... ”).

. During the 1994 rulemaking, EPA stated its intent to apply the 90-day advance reporting requirement to new substitutes for class II substances, even though the statute only expressly mentions the advance reporting requirement in the context of substitutes for class I substances. J.A. 42. This deadline for review following advance notice and reporting is the same as in the petition process, where Congress required that EPA, within 90 days, to “grant or deny” a petition to add a substitute to, or remove a substitute from, either the safe alternatives list or the unsafe alternatives list for class I and class II substances. 42 U.S.C. § 7671k(d).

. Similarly, in this same passage,- EPA also stated "[wjhere second-generation substitutes replace first-generation substitutes. that are themselves ozone-depleters (e.g.; HCFCs), these second-generation substitutes are bound by the same notification and review requirements under section 612 as first-generation substitutes to ozone-depleting chemicals.” Id. (emphasis added).